# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 22, 2010

## STATE OF TENNESSEE v. BRYANT C. OVERTON

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-61909C     David Bragg, Judge**

---

**No. M2009-01977-CCA-R3-CD - Filed February 15, 2011**

---

A Rutherford County jury convicted the Defendant, Bryant C. Overton, of aggravated kidnapping, aggravated robbery, attempted first degree murder, and conspiracy to commit kidnapping. The trial court ordered the Defendant to serve an effective sentence of sixty years in the Tennessee Department of Correction.  On appeal, the Defendant contends that the evidence is insufficient to support his convictions.  After a thorough review of the record and the applicable law, we affirm the trial court's judgments in part, but we reverse them in part based upon a sentencing error.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part and Reversed in Part**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

R. Wilford Fraley, III, Murfreesboro, Tennessee, for the Appellant, Bryant C. Overton.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Lindsy Paduch Stempel, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; J. Paul Newman, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from events that occurred on December 15, 2007, when the victim was

taken to a ditch and shot multiple times. Based on these events, a Rutherford County grand jury indicted the Defendant for conspiracy to commit kidnapping, especially aggravated kidnapping, especially aggravated robbery, and attempted first degree murder. The following evidence was presented at the Defendant's trial: Darice Brown, the victim in this case, testified that on December 15, 2007, she had a conversation with one of the co-defendants, Robert Adams ("P.T."), who was seeking to purchase cocaine. The victim said that P.T. asked the victim to "call somebody for him," so she called "B.I.," a man she knew supplied cocaine. The victim said that she had "been around" B.I. before, but had never purchased drugs from him. The victim arranged a meeting with B.I. at Wal-Mart at 7:30 p.m., and B.I. instructed her to come alone because he "didn't deal with men."

The victim testified that the Defendant and his three co-defendants, P.T., Kesha Adams ("Cash"), and Kristie Ray ("Michelle") picked the victim up at her house. The victim recalled that Michelle was driving, Cash was in the passenger seat, and the victim was seated in the back between the Defendant and P.T. When they arrived at Wal-Mart the victim exited the vehicle and the Defendant and P.T. followed her but remained outside of the Wal-Mart while the victim went inside and spoke with B.I. B.I. asked the victim who the two men were, and the victim told B.I. the men's identities. B.I. said, "[N]ever mind," indicating he would not proceed with the drug transaction, so the victim returned to the car and informed the others. P.T. instructed the victim to try again and, this time, to take Cash with her. The victim called B.I. and arranged to meet B.I. at his car with Cash, while P.T. and the Defendant remained in Michelle's car. P.T. gave Cash the money to purchase the cocaine and Cash completed the exchange with B.I.

The victim testified that, upon returning to the car, the Defendant said, in reference to B.I., "I know that nigger. I had a beef with him last summer." The Defendant asked the victim if she knew where B.I. lived and asked P.T. to give him a gun. P.T. passed the Defendant the gun across where the victim was seated in the car. The victim testified that, up until this gun was produced, she was unaware of a weapon in the car. The Defendant then instructed the victim to call B.I. and to show them where B.I. lived. The victim agreed to call B.I. but told the Defendant she did not know where B.I. lived, but the Defendant did not believe her. Michelle pulled over and waited, while the victim attempted to call B.I. with no success. The victim said she then called her cousin and asked where B.I. lived. Her cousin responded by asking whether the victim was in trouble, and the Defendant instructed the victim to disconnect the phone call so she complied. Michelle indicated that she knew where B.I. lived and began driving, but the Defendant told her to stop and take the ramp to "get back on the interstate."

The victim testified that, once they were on the ramp, P.T. stuck his finger in the cocaine, tasted it, and said it "wasn't real." P.T. then passed the cocaine to Cash who also

tasted it and agreed that the cocaine "wasn't real." The victim recalled that the situation then escalated with the Defendant insisting that she knew where B.I. lived. The victim testified that she did not feel free to leave and that P.T. had told the victim that she "wasn't going anywhere unless he got his money or [his] drugs." The victim asked the Defendant if "this [was] about money" and offered to help recover his money. Cash said "put the bitch out and make her walk or we could tie her up." The victim, who had been pushing "send" on her phone in hopes of someone overhearing the conversation, reached for her phone that was between her legs, and the Defendant "snatched the phone" from her. The victim said that she was fearful and relinquished her cell phone because the Defendant "had a gun and he wanted it."

The victim testified that the Defendant instructed Michelle where to drive, leading the group to a remote location. During the drive, Cash continued to suggest to P.T. things they could do to the victim. The victim recalled that the Defendant told the victim that she "thought [she] was too good for him." and that P.T. told her that "somebody was going to die tonight." The Defendant finally told Michelle to stop the car in an unlit location. The Defendant opened the car door, took the victim's purse, and then pulled the victim out of the car with her back facing him. The victim recalled feeling the first gunshot to her leg and hitting the ground. The victim was facing Michelle's car and could see the Defendant's feet but nothing else. The victim testified, "I felt the first one and I held my mouth because I didn't want [the Defendant] to hear me scream. And I just waited for it to hit my head. I waited to die. I thought [the Defendant] was going to kill me." The victim said that she heard "a lot" of shots until the gun "clicked" indicating there were no more bullets. The Defendant then instructed Michelle to "go," a car door shut, and the four co-defendants drove away.

The victim explained she could not call for help because the Defendant drove away with her cell phone. The victim recounted what occurred after the shooting:

> I laid there because it was warm and I couldn't move my leg. I just laid there and I prayed. And I guess I had laid there so long that the temperature had dropped and it started to mist. And [it] got to where I could slide. So I took my elbows and stuck them in the mud and pulled myself until I got to the highway.

The victim explained that she could not walk because her femur was shattered from the gun shots. The victim said that she pulled herself into the middle of the road and laid there hoping someone would find her. A car finally did stop, and the victim asked its occupants to call her family. An ambulance arrived and took the victim to Middle Tennessee Medical Center where she was stabilized. She later was air-lifted to Vanderbilt Hospital and treated in the trauma unit.

3

The victim testified that, when she woke up in the hospital, she had a colostomy bag, a rod in her left leg, liver damage, a fractured pelvis, four bullets in her body and her elbows were damaged. The victim said that she could not initially speak because she was "breathing through a tube." The victim said that she wore the colostomy bag for six months until doctors were able to reconnect her intestines after she sustained injuries to her rectum. The victim testified that she has had "no less than seven" surgeries related to the injuries resulting from this shooting. The victim acknowledged that she used a cane in court that day as a result of the injuries from the shooting.

The victim testified that, while inside Michelle's car, she did not feel she had any control over what happened, explaining, "Once the gun came out, I felt trapped." Likewise, she said that when the Defendant took her phone she did not feel she had any choice but to relinquish it because he had a gun.

The victim testified that, while at Vanderbilt hospital, detectives showed her photographic line-ups, and she positively identified the Defendant and the three co-defendants.

The victim acknowledged that she had two prior felony convictions, explaining that she was with "someone" who sold drugs to an informant. As a result, she was charged and convicted of conspiracy to sell drugs for being present during the drug sale.

On cross-examination, the victim testified that she did not intend to use any of the half-ounce of cocaine Cash purchased from B.I. for $450. The victim said that, at the location where she was shot, she could see a house in the distance, but it was so dark she "couldn't see [her] hand in front of [her] face." The victim recalled that the Defendant immediately shot her upon her exit from the vehicle and that, as she was lying on the ground, she saw the Defendant's white Nike Air Force One shoes. The Defendant got back into the car, and instructed Michelle to drive away.

Stevie Trotter testified that as her husband Ryan Trotter was driving herself, Phillips, and Michael Glossop home from a Christmas party, the group saw a woman in the road as they drove down Beasley Road. Trotter's husband stopped the car and went with Glossop to try to speak with the victim. Trotter said she was able to communicate with the victim although the victim's voice was "faint." The victim told Trotter her name, said someone she knew had shot her, and said "something about drugs."

Ryan Trotter testified that he saw the victim lying in the street as he drove down Beasley Road. He parked his car and approached the victim, initially unable to tell she was shot, and asked why she was in the road. The victim indicated that she had been shot. Ryan

4

asked the victim, multiple times, who shot her, but the victim's responses were difficult to understand. Ryan said, "[T]he only thing I could make out was like D or Debo." Upon being asked, Ryan said that he had never seen the Defendant before and did not know his name or nickname.

David Hailey, a Rutherford County Sheriff's Department lieutenant, testified that, when he arrived at the scene, emergency responders were loading the victim into the ambulance. Based upon the seriousness of her injuries and his concern that she might not survive the injuries, Lieutenant Hailey got into the ambulance and spoke with the victim before the ambulance transported her to the hospital. Lieutenant Hailey said it was difficult to understand the victim, but he "got down real close to her face." The victim repeatedly told Lieutenant Hailey that Debo shot her. The Lieutenant, thinking the victim was trying to say something else, asked her repeatedly for the name of the shooter and the victim repeated Debo. The victim also provided the names of three other individuals: Cash, P.T., and Michelle. Lieutenant Hailey said that he "stayed out of the scene" to preserve the evidence but that he saw a purse lying in the road and what appeared to be marks left from the victim dragging her body across the road.

Duane Jackson, a Rutherford County Sheriff's Department detective, testified that, later on the day of the shooting, he interviewed the victim at Vanderbilt hospital. The victim was unable to talk at that time, but she wrote down the answers to the detective's questions. When he asked the victim who shot her, she responded by writing "Debo." The victim further indicated that fake drugs were sold during a drug transaction and that Debo was upset due to her involvement in the drug transaction. The detective showed the victim a photographic line-up that included the Defendant's photograph. The victim indicated that the Defendant was the shooter and showed no hesitation in identifying him.

Dr. Richard Miller testified that he treated the victim upon her admission to Vanderbilt hospital trauma unit and continued to treat the victim at the time of the trial. Dr. Miller testified that the victim sustained multiple gunshot wounds, which caused major liver damage, a fractured femur bone, and a hole in the victim's rectum. All of these injuries required major operative intervention and were "life threatening injuries."

James Martin, a Rutherford County Sheriff's Department deputy, testified that he recovered shell casings and a white purse at the crime scene. At a later point, Deputy Martin collected from Middle Tennessee Medical Center the victim's blood-stained clothing, which contained bullet holes.

Based upon this evidence, the jury convicted the Defendant of conspiracy to commit kidnapping, aggravated kidnapping, aggravated robbery, and attempted first-degree murder.

5

The trial court ordered the Defendant to serve an effective sentence of sixty years in the Tennessee Department of Correction.

## II. Analysis

The Defendant asserts that the evidence is insufficient to sustain his convictions. The State responds that a reasonable juror could conclude from the evidence that the Defendant committed each of the offenses for which he was convicted. The State, however, draws this Court's attention to the fact that the judgment entered for the Defendant's conviction for aggravated robbery, a Class B felony, incorrectly reflects a conviction for especially aggravated robbery, a Class A felony, and a sentence commiserate with a Class A felony. Accordingly, the State asks this Court to remand this case for the trial court to enter an amended judgment of conviction and a correct sentence.

### A. Sufficiency of the Evidence

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). A conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone." *State v. Smith*, 868 S.W.2d 561, 569 (Tenn. 1993). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v.*

*Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

The Defendant challenges the credibility of the testimony of witnesses as the basis of his sufficiency argument. We note that it is the jury's prerogative evaluate and weigh the evidence. Any alleged inconsistent statements and credibility issues were brought out on direct or cross-examination. The weight and credibility of the testimony of a witness and the reconciliation of conflicts in testimony, if any, are matters entrusted exclusively to the jury. By its verdict, the jury exercised its prerogative and chose to accredit the testimony of the State's witnesses. Nonetheless, we will review the Defendant's case in its entirety for the sufficiency of the evidence.

### A. Conspiracy to Commit Kidnapping

In this case, the Defendant was convicted of conspiracy to commit kidnapping, which requires proof beyond a reasonable doubt that "two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense." T.C.A. § 39-12-103 (2009). Further, the State must prove an overt act in pursuance of the conspiracy. T.C.A. § 39-12-103(d). As applicable to this case, a person commits kidnapping when he/she knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty and under circumstances that exposed the other to a substantial risk of bodily injury. T.C.A. § 39-13-302(a)(1) (2009); *see also*, T.C.A. § 39-13-302 (2009).

7

The evidence, considered in the light most favorable to the State, proves that the Defendant, a passenger in Michelle's car, picked up the victim at her home and drove to a location where the victim had arranged for P.T. to buy drugs. The victim was seated between the Defendant and P.T. in the back seat of the car. After P.T. completed the drug transaction, he determined that the drugs were not real. He told the victim she "wasn't going anywhere" unless he got his money or the drugs. The Defendant was holding a gun, which was visible to the victim. The victim was in fear and could not flee the vehicle because she was seated between the two men in the backseat and did not feel she could leave. The Defendant instructed Michelle where to drive and ultimately where to stop the vehicle. During the drive, Cash suggested they abandon the victim or "tie her up." Upon arriving at an unlit location, the Defendant pulled the victim from the vehicle and shot her repeatedly. The Defendant then instructed Michelle to drive away, leaving the victim injured and alone.

This evidence shows that the victim was physically confined between the Defendant and P.T. in the backseat, which prevented her from exiting the vehicle. Moreover, she did not feel free to exit the vehicle based upon P.T.'s statement to her that she "wasn't going anywhere" and the Defendant's possession of a gun. The Defendant, Michelle, and Cash collaborated to accomplish the victim's confinement: Michelle drove to a remote, dark location as instructed by the Defendant and later drove the group away from this location, leaving the injured victim in an isolated location. Cash suggested abandoning the victim and tying the victim up, while P.T. told the victim that she was not free to leave. The Defendant orchestrated these events and shot the victim repeatedly until he ran out of bullets. The evidence shows, therefore, that the Defendant, Michelle, and cash, "each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense," agreed to kidnap the victim and that the Defendant took an overt act toward doing so. T.C.A. § 39-12-103.

Accordingly, we conclude that the evidence is sufficient to support the jury's finding the Defendant guilty of conspiracy to commit kidnapping beyond a reasonable doubt. As such, the Defendant is not entitled to relief on this issue.

## B. Aggravated Kidnapping

The Defendant was convicted of aggravated kidnapping, which required the State to prove beyond a reasonable doubt that the Defendant knowingly removed or confined the victim unlawfully so as to interfere substantially with her liberty, and either that the victim

8

suffered bodily injury or that the Defendant was in possession of a deadly weapon. T.C.A. § 39-13-304(a)(3) & (4) (2009); *see also*, T.C.A. § 39-13-302 (2009).

The evidence in this case proves that the victim was confined in the backseat of a car between the Defendant and P.T. The victim was told that she "wasn't going anywhere," and the Defendant instructed Michelle to drive to a location that proved to be remote and dark. The Defendant prevented the victim from making any phone calls by taking her cell phone from her. The Defendant requested a gun, and P.T. handed the Defendant a gun by passing it over the victim who sat between them. Further, the victim suffered life-threatening injuries, which required major operative intervention as a result of the Defendant's shooting her repeatedly.

Accordingly, we conclude that the evidence is sufficient to support the jury's finding the Defendant guilty of aggravated kidnapping beyond a reasonable doubt. As such, the Defendant is not entitled to relief on this issue.

### C. Aggravated Robbery

As relevant to this case, a conviction for aggravated robbery requires the "intentional or knowing theft of property from the person of another by violence or putting the person in fear" and is "accomplished with a deadly weapon." T.C.A. § 39-13-401 and 402 (2009).

The evidence, in the light most favorable to the State, proves that, while riding in the car, the Defendant asked P.T. for a gun. P.T. passed the Defendant the gun in front of the victim who was seated between the two men, and then the Defendant held the gun on his lap, visible to the victim. While the victim was attempting to use her phone to call for help, the Defendant took the victim's phone from her and kept it. The victim relinquished the phone because she was fearful and the Defendant possessed a gun.

Accordingly, we conclude that the evidence is sufficient to support the jury's finding the Defendant guilty of aggravated robbery beyond a reasonable doubt. As such, the Defendant is not entitled to relief on this issue.

### D. Attempted First Degree Murder

First degree murder is the premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1) (2009). Therefore, to convict the Defendant of attempted first degree murder, the State was required to prove that the Defendant acted with the kind of culpability otherwise required for first degree murder. T.C.A. § 39-12-101(a)(2) - (3) (2009). That is, that the Defendant acted "with intent to cause a result that is an element of the offense, and believe[d] the conduct [would] cause the result without further conduct on [his] part," or the Defendant acted "with intent to complete a course of action or cause a result that would constitute the offense, under circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." *Id.*

Whether a defendant has acted with premeditation is an issue for the finder of fact to determine, and it may be inferred from the manner and circumstances of the attempted killing. *State v. Holder*, 15 S.W.3d 905 (Tenn. Crim. App. 1999). Facts which may be indicative of premeditation include: the use of a deadly weapon on an unarmed victim; the shooting of the victim after the victim has turned to retreat or escape; the lack of provocation on the part of the victim; the defendant's declaration of his intent to kill; procurement of a weapon; multiple wounds; and the defendant's failure to render aid to the victim. *State v. Lewis*, 36 S.W.3d 88, (Tenn. Crim. App. 2000); *State v. Evans*, No. W2002-02744-CCA-R3-CD, 2004 WL 2439257, at *7 (Tenn. Crim. App., Oct. 29, 2004), *no Tenn. R. App. P. 11 application filed*.

The evidence, in the light most favorable to the State, proves that the victim arranged a drug deal at the request of P.T. After the transaction was completed, the Defendant stated he had an issue with the dealer, B.I., and demanded the victim call B.I. and take him to B.I.'s residence. The Defendant asked P.T. for a gun, which P.T. handed to the Defendant across where the victim, who sat between the two men. P.T. stated that "somebody was going to die tonight" and told the victim she "wasn't going anywhere." The victim could not reach B.I. by phone and told the Defendant she did not know where B.I. lived. The situation escalated as the victim continued to deny knowing the location of B.I.'s residence and as P.T. announced that the drugs were fake. The victim offered to help recover the money and complied with every demand the Defendant made. The victim did not have a weapon and never provoked the Defendant or any occupant of the car. The Defendant took and kept the victim's cell phone, preventing her from summoning help. The Defendant pulled the victim from the vehicle and immediately began shooting the victim from behind until he ran out of bullets and then abandoned the injured victim.

Based upon this evidence, we conclude that the evidence is sufficient to support the jury's finding the Defendant guilty of attempted first degree murder beyond a reasonable doubt. As such, the Defendant is not entitled to relief on this issue.

## E. Sentencing

The State raises an error in sentencing. The Defendant was charged with especially aggravated robbery. The jury, however, convicted the Defendant of the lesser-included offense of aggravated robbery, a Class B felony. The judgment form, as well as the transcript from the sentencing hearing, reflect that the trial court incorrectly entered a judgment of conviction against the Defendant for especially aggravated robbery, a Class A felony, and sentenced him for this felony.

Accordingly, we remand this case to the trial court to sentence the Defendant consistent with the jury's verdict of aggravated robbery and amend the judgment of conviction form and sentence consistent with a conviction for aggravated robbery rather than especially aggravated robbery.

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the Defendant's convictions and remand this case for the trial court to enter an amended judgment of conviction indicating that the Defendant was convicted of aggravated robbery, rather than especially aggravated robbery, and for the trial court to properly sentence the Defendant on this conviction.

_____
ROBERT W. WEDEMEYER, JUDGE